# IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF GEORGIA
### MACON DIVISION

|  |  |
|---|---|
| **YVETTE BRANCH,** | |
| *Plaintiff,* | |
| **v.** | **CIVIL ACTION NO.** |
| | **5:20-cv-00380-TES** |
| **NAVICENT HEALTH, INC., and SIMEON SESSLEY,** *in his individual capacity*, | |
| *Defendants.* | |

## ORDER DENYING DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

In the wake of some financial issues, Navicent Health, Inc., a hospital in Macon, Georgia, sought to improve certain aspects of its business by enlisting help from a company by the name of GE Healthcare which is, of course, affiliated with General Electric. [Doc. 62-1, ¶¶ 30–31]; [Doc. 53, Martin Depo., p. 25:15–16]. GE Healthcare provides a variety of products and services aimed at helping healthcare providers, like Navicent, better operate their businesses. [Doc. 62-1, ¶ 30]. Starting in December 2017 and continuing into 2018, GE Healthcare partnered with Navicent, and one of GE Healthcare's key roles was to consult with Navicent to help make its business more efficient by improving its processes and reducing and eliminating unnecessary costs. [*Id.* at ¶¶ 31, 34].

GE Healthcare, though, wasn't just consulting with Navicent for consulting's

sake. [Doc. 53, Martin Depo., p. 15:3–4]. In truth, GE Healthcare's consultation services stemmed from General Electric's relationship with Navicent and the General Electric products that Navicent uses. [*Id.* at pp. 14:24—15:1]. And, although GE Healthcare's services primarily focused on areas one would consider "logical" for GE Healthcare, the Navicent-GE Healthcare partnership brought about some fairly seismic changes for Navicent. [*Id.* at p. 15:5–6]. Speaking in "big picture" terms, a primary purpose of the partnership was for GE Healthcare to help Navicent reach a targeted savings goal of $150 million over a multi-year period by addressing different areas of concern—things like expenses, efficiency, productivity, and organization—and leaders from both entities worked together on hundreds of sub-projects to reach the overall $150 million goal. [Doc. 62-1, ¶¶ 35–36].

At this point, it probably seems like this lawsuit is one about business relations gone array between Navicent and GE Healthcare, but it's not. Instead, it presents a perplexing "Whodunnit?" situation with respect to the termination of a Navicent employee. Question is: Was her termination a product of organizational restructuring as a result of the partnership; a consequence of her performance issues; or was it for some other, potentially, unlawful reason?

## FACTUAL BACKGROUND

### A.    Introduction

The answer to this question lies somewhere in the mix of a somewhat

complicated corporate setting and its intersection with high-level corporate

management systems. To present the facts of this case briefly and simply and without

losing the reader along the way is no easy feat. But, stay with it, and you'll see why a

jury—not the Court—has to be the one that decides who it believes in order to unravel

the knotted and competing narratives that are about to unfold. *See Sconiers*, *infra*.

**B.**     **Lean Six Sigma**

As a means to eliminate waste in the hospital niche of healthcare, Navicent, like

many other large businesses throughout corporate America, implements a tool known

as Lean Six Sigma. [Doc. 53, Martin Depo., pp. 21:21–22; 22:21]; [Doc. 51, Sessley Depo.,

p. 19:20–22]. "Lean" refers to working to eliminate waste effectively. [Doc. 53, Martin

Depo., p. 22:2–3]. "Six Sigma," on the other hand, entails an organization's examination

of its nonvalue-added activities in order to "lean" and reduce waste as a consequence of

those activities. [*Id.* at p. 22:6–8]. For example, in the hospital setting, a hospital may use

a preference card on which each of its surgeons can list "all the [surgical tools] that the

surgeon prefers." [*Id.* at p. 23:2–5]. Sometimes though, only half of the opened surgical

tools will be used, wasting the other half. [*Id.* at p. 23:5–9]. In this example, Lean Six

Sigma's techniques may cause the hospital to only open those preferred tools that are

"certain of" use for a given surgery and allow it to salvage any unopened surgical tools

that would have otherwise been thrown away. [*Id.* at p. 23:9, 12–14]. Implementing a

plan like this example attempts to minimize the hospital's waste while simultaneously

ensuring that surgeons have what they need. [*Id.* at p. 23:10–12].

Not to downplay the complexity of its methods but Lean Six Sigma essentially offers "a keen eye" towards evaluating what activities reduce the overall value of an organization. [*Id.* at pp. 23:23—24:2]. Within Lean Six Sigma, there is a hierarchy of certification levels, each requiring a different type of training—Yellow Belt; Green Belt; Black Belt; and its highest level, Master Black Belt. [*Id.* at pp. 24:19—25:3]; [Doc. 62-1, ¶¶ 2–3].

### C.    Navicent's Reporting Structure

After applying for Navicent's Master Black Belt position in January 2017, Plaintiff Yvette Branch accepted Navicent's offer for the position on April 6, 2017. [Doc. 62-1, ¶¶ 1, 8]. As Navicent's Master Black Belt, Branch reported to Simeon Sessley. [*Id.* at ¶ 9]. Sessley, who Navicent hired in 2016 as the Executive Director of the Center for Disruption and Innovation ("CfDI"), was Branch's only immediate supervisor for the entirety of her employment with Navicent. [*Id.* at ¶¶ 9–10].

After Navicent hired Christopher Cornue in 2015 as its Chief Strategy Officer, he formed the CfDI group to focus on four areas—innovation, continuous improvement, research, and horizon screening—all driven by the promotion of Navicent's success as a health system. [Doc. 55, Cornue Depo., pp. 10:9–17; 11:14—12:6]; [Doc. 62-1, ¶ 13]. As is commonplace in many health systems, Navicent had a process improvement team— sometimes referred to as its "Horizon 1 Continuous Improvement" team—as a subset of

its CfDI tasked with heading "near term projects that need to be executed[.]" [Doc. 55, Cornue Depo., p. 43:24—44:3]; [Doc. 53, Martin Depo., p. 43:17–19]. Branch and Sessley were part of this team. [Doc. 62-1, ¶ 12]. So, in terms of hierarchy: Branch reported to Sessley, Sessley reported to Cornue, and Cornue reported to Dr. Ninfa Saunders— Navicent's Chief Executive Officer from 2012 until her retirement in 2020.[1] [*Id.* at ¶ 14].

### D.   GE Healthcare's Reporting Structure

With Dr. Saunders, Cornue, Sessley, and a few other individuals being the Navicent folks involved in discussions with GE Healthcare, who's on the GE Healthcare side of this partnership? [Doc. 53, Martin Depo., pp. 33:22—34:2]; [Doc. 53-1, p. 7]. First, there's Geoffrey Martin. Martin (alongside Dr. Saunders for Navicent) was GE Healthcare's executive sponsor of the partnership. [Doc. 53, Martin Depo., p. 34:13–21]. In short, Martin was GE Healthcare's lead person.

Beneath Martin, Rich Pearson served as GE Healthcare's subject-matter expert on Lean Sigma Six, and Chuck Taylor took the lead on GE Healthcare's day-to-day operations in Macon. [Doc. 62-1, ¶ 33]; [Doc. 53, Martin Depo., pp. 35:3–4; 35:20—36:1; 46:18–21]. Martin oversaw projects for other customers during the Navicent-GE Healthcare project, so he spent the vast majority of his time in other cities. [Doc. 53, Martin Depo., pp. 37:12–15; 37:21—38:1]. Pearson and Taylor, on the other hand, along

---

[1] Branch originally named Dr. Saunders as a defendant in this lawsuit; however, pursuant to a joint motion, the Court previously dismissed all claims against her with prejudice. [Doc. 43]; [Doc. 44].

with other GE Healthcare personnel had much more of a physical presence in Macon causing Navicent's CfDI team—with the exception of Branch—to move out of its office space so they could occupy it. [*Id.* at pp. 37:7–11; 50:1–7]. Branch didn't have to relocate her office space because of her role in the Horizon 1 Continuous Improvement team within Navicent's CfDI group and because she was going to be working so closely with Pearson. [*Id.* at p. 50:1–13]; [Doc. 62-1, ¶ 37].

    **E.**    **The Process Improvement Initiative**

Like normal, the Navicent-GE Healthcare project started with a run-of-the-mill sales and diligence period starting in mid-2017, the formal contract signing in December 2017, and a project kick off in January 2018. [Doc. 53, Martin Depo., pp. 25:4–12; 27:5–7]. Once GE Healthcare conducted its initial assessment of Navicent's processes, it worked with its Navicent counterparts to identify opportunities to drive efficiencies and reduce waste. [*Id.* at pp. 38:17—39:1]. Very simply, Navicent and GE Healthcare worked in tandem to assess Navicent's areas of weakness, design and implement solutions for those weaknesses, and support those solutions on an ongoing basis. [*Id.* at pp. 39:5–8; 44:18–21].

As part of the collaborative efforts to address Navicent's weaknesses, the Navicent-GE Healthcare project created the term "ISFP," which stood for Integrated Strategic Financial Planning. [*Id.* at p. 39:13–25]. The actions implemented as a result of ISFP required Navicent to hold monthly meetings in support of running the hospital,

conduct quarterly strategy reviews, create one-year budgets that were firmly adhered to, and develop well-defined strategic plans that were to span a total of three years. [*Id.* at p. 40:1–11, 21–24]; [Doc. 62-1, ¶ 54]. One of the Navicent groups selected to be part of the ISFP process was, of course, the Horizon 1 Continuous Improvement team—the subset of Navicent's CfDI group of which Branch was an integral part. [Doc. 53, Martin Depo., pp. 44:12—45:13]. GE Healthcare may have been the how-to facilitator in helping Navicent tackle its financial shortcomings, but at the end of the day, both Navicent and GE Healthcare decided that the Horizon 1 Continuous Improvement team would provide the much-needed "stewardship" from Navicent when it came to producing relevant data and connecting resources. [*Id.* at pp. 41:16–17; 45:5–13]. Obviously, intricate and demanding work.

With Branch and Pearson at the helm of the Navicent-GE Healthcare project's process improvement initiative, they worked and strategized together on how to address GE Healthcare's concerns it identified from its initial assessment of Navicent's processes. [*Id.* at pp. 44:15—45:1]. The ISFP process would, eventually, lead to a July 2018 meeting during which Navicent's Horizon 1 Continuous Improvement team would co-present "to broader [Navicent-GE Healthcare] leadership" what its strategic plan entailed. [*Id.* at pp. 42:24—43:3; 45:21–22].

F.    **Branch's Father's Medical Condition**

Before we can even delve into the specifics of that meeting and its aftermath, the

7

Court pauses to note that at some point during her employment with Navicent, likely around January 2018, Branch "feels confident" that she told Sessley about her father suffering from Alzheimer's disease and dementia. [Doc. 57, Branch Depo., pp. 165:8–9, 16–20; 177:10–13; 178:18–23]. According to Branch, Sessley didn't have any negative reaction to her disclosing her father's medical condition, and as for the other "higher-ups" at Navicent—Cornue and Dr. Saunders—Branch never discussed it with them. [*Id.* at pp. 179:9–14; 181:17–20]. Suffice it to say, Branch simply doesn't know whether Cornue or Dr. Saunders were "ever aware of [her] father's medical condition[] or Alzheimer's disease[.]" [*Id.* at pp. 181:21—182:5].

Even though Branch may have felt confident that she told Sessley those details about her father, Sessley doesn't "recall her ever mentioning her father's specific health condition." [Doc. 51, Sessley Depo., pp. 26:5—27:17]. Regardless of whether Branch disclosed any specifics about her father's health to Sessley, it's undisputed that she told Sessley she needed to apply for intermittent leave under the Family Medical Leave Act ("FMLA") "so that she could be available on an as[-]needed basis to go to Michigan to help her mother care for her father." [Doc. 62-1, ¶ 48]; [Doc. 57, Branch Depo., pp. 170:16—171:2; 183:8–12]. So, around July 2018, Sessley, acting on Branch's request that he find out and share with her Navicent's process for FMLA leave, inquired with the Director of Human Resources Services for Navicent. [Doc. 62-1, ¶ 52]. From there, Sessley was told that it was "best [to] start with Clint Jones[,]" one of Navicent's human

resources representatives on its Employee Relations team.[2] [*Id.*]; [Doc. 51, Sessley Depo., p. 31:2–16, 22–23]; [Doc. 51-3, p. 1].

### G.      The July 2018 Meeting for Integrated Strategic Financial Planning

Now, let's go back to that ISFP meeting mentioned earlier. Attendees at this two-day meeting, held on July 10–11, 2018, included Dr. Saunders from Navicent, Martin and Taylor from GE Healthcare, and others from across both entities. [Doc. 62-1, ¶ 53]. "The presentations given by the groups participating in the IFSP meeting were[,]" according to Martin, "an important part of the strategic planning process in the [Navicent-GE Healthcare project] and the culmination of the groups' earlier strategic planning work." [*Id.* at ¶ 55]. On the second day of the meeting, Branch presented on behalf of the Horizon 1 Continuous Improvement team for Navicent, and while she thought that her "presentation somewhat fell short[,]" Sessley says she "bombed[.]" [*Id.* at ¶¶ 56, 60]; [Doc. 57, Branch Depo., p. 266:21–24]; [Doc. 51, Sessley Depo., p. 91:15].

From Dr. Saunders' perspective, Branch's presentation "wasn't clear," and "it came across that she did not know her content." [Doc. 49, Saunders Depo., p. 43:12–25]. The following morning, Dr. Saunders sent a text message to Sessley conveying her opinion of Branch's presentation. [Doc. 51-10, p. 4]. To an extent, that opinion didn't bode well for Branch. Dr. Saunders expressed that "[m]aybe [she] was expecting

---

[2] Branch also originally named Jones as a defendant in this lawsuit; however, within weeks of filing it, she voluntarily dismissed her claims against him. [Doc. 5].

[Branch] to be more advanced and sophisticated given her [Master Black Belt]

background." [*Id.*]. In a lengthy response, Sessley texted back,

> [Y]ou're definitely a good read of people[,] and I will share that I am closely monitoring [Branch's] ability to influence and impact change as well as the GE [Healthcare] team's agenda which unintentionally may be constraining some of [Branch's] ability to drive impact. I am really glad you cleared the air yesterday on your expectations in front of everyone[.]

[*Id.* at pp. 5–7]; [Doc. 62-1, ¶ 60]. The only thing Cornue learned about the meeting was

that "the presentation didn't go as well as they had planned[.]" [Doc. 62-1, ¶ 60]; [Doc.

55, Cornue Depo., p. 63:9–20].

Despite what could most graciously be perceived as mixed opinions about her

presentation, neither Dr. Saunders, Sessley, nor Cornue ever recall informing Branch

that she was "at odds with" senior leadership or that she "failed to grasp" senior

leadership's strategic initiatives. [Doc. 49, Saunders Depo., p. 47:4–12]; [Doc. 51, Sessley

Depo., pp. 82:12—83:5]; [Doc. 55, Cornue Depo., pp. 65:6—66:3]. What's more, nobody

recalls whether Branch was ever counseled, written up, reprimanded, or informed that

her job was in jeopardy as a result of her presentation. [Doc. 62-1, ¶ 60]; [Doc. 51,

Sessley Depo., pp. 83:17—84:11]; [Doc. 55, Cornue Depo., pp. 64:23—65:5]. In fact,

according to Sessley, it wasn't "even possible" for Branch to be "disciplined or

reprimanded in any manner as a result of [her] presentation[.]" [Doc. 51, Sessley Depo.,

pp. 83:23—84:11]. But, compare that testimony with Sessley's later testimony where he

testified that it "was purely [his] understanding" that Branch's performance issues in

such "a critical presentation to a senior executive committee *did* play or contribute

something to . . . her role being eliminated behind closed doors." [*Id.* at p. 147:16–25]

(emphasis added). As you'll see below, Sessley wasn't behind those "closed doors," but

he does believe that Branch's performance at the ISFP meeting "played a role in terms

of how . . . certain decisions" were made. [*Id.* at pp. 147:20—148:4].

### H.   <u>GE Healthcare's Concerns with the Process Improvement Initiative</u>

You'll notice that right around the time Branch started seeking information about

how to apply for FMLA leave, she also made her presentation at the ISFP meeting.

Although those two parallel timelines are important, there is, of course, a third one that

comes into play to further complicate matters. During the course of the Navicent-GE

Healthcare partnership, the GE Healthcare representatives, namely Pearson and Taylor,

developed concerns and encountered issues with the progress and performance of the

joint Navicent and GE-Healthcare initiative for process improvement. [Doc. 62-1, ¶ 39].

The Navicent side of that joint initiative was the Horizon 1 Continuous Improvement

team—Branch's team. [Doc. 53, Martin Depo., pp. 44:12—45:13]. Generally speaking, GE

Healthcare had two issues with Navicent's side of the joint initiative—a "staffing issue"

and a "performance issue"—that resulted in GE Healthcare "being left to do more work

than they felt was fair in the spirit of a partnership." [*Id.* at p. 103:4–6]; [Doc. 60-1,

Taylor Decl., ¶¶ 7–8]; [Doc. 62-1, ¶¶ 40–41]. If the joint process improvement initiative

was going to be able meet its $10 million targeted financial benefit and not fall behind

on its objectives in order to help Navicent reach the overall target goal of $150 million,

GE Healthcare conveyed that it needed more resources—more "bodies"—in Navicent's

process improvement team "to do stuff." [Doc. 53, Martin Depo., pp. 61:17—62:6; 74:7–

17]; [Doc. 62-1, ¶¶ 38, 41, 45].

According to Taylor, GE Healthcare's day-to-day leader, Navicent personnel

struggled to meet the deadlines necessary to propel the partnership forward. [Doc. 53,

Martin Depo., pp. 35:3–4]; [Doc. 60-1, Taylor Decl., ¶ 7]. In his opinion, the root of

Navicent's problems was its organizational structure as well as staffing and skillset

issues from within its Horizon 1 Continuous Improvement team. [Doc. 60-1, Taylor

Decl., ¶ 8]. Put simply, with respect to organizational structure, Taylor thought that

Navicent had its process improvement team reporting to the wrong people. [*Id.*]. More

importantly, with respect to staffing within that team, Taylor says that it was too

limited. [*Id.*]. As Navicent's only Master Black Belt, its process improvement efforts

rested largely on one person—Branch, and GE Healthcare wasn't without concern when

it came to her performance. [*Id.*]; [Doc. 62-1, ¶ 44]. Because of Navicent's staffing

dynamic, Taylor took the position that Navicent needed one full-time Master Black Belt

plus two full-time Black Belts so that the components and goals for process

improvement could be fully executed in order to aid in the overall success of the

partnership. [Doc. 60-1, Taylor Decl., ¶¶ 5, 8].

That said, though, when it came to Branch's skillset, Taylor quite candidly

thought it "had some gaps." [*Id.* at ¶ 8]. And although Taylor thought those gaps could be resolved with training and coaching, he felt that Branch simply "lack[ed] engagement." [*Id.*]. In his experience with Branch, she failed to show up for training, didn't effectively lead meetings, and missed deadlines. [*Id.*]. And while those reasons seem to point all fingers at Branch, Taylor also cautiously hedged that her "lack of engagement" could have been driven by Navicent's faulty organizational structure and its lacking resources. [*Id.*].

But what was Martin's view on all of this? Because of his role as the executive sponsor in the Navicent-GE Healthcare partnership, he normally "would never get into the details of individual employees[.]" [Doc. 53, Martin Depo., pp. 34:13–21; 74:1–2, 13–16]. Only when "things . . . were . . . limiting [Navicent and GE Healthcare's] ability to be successful[,]" would he get involved. [*Id.* at p. 74:4–6]. Well, because concerns of Branch's performance "escalated to [Martin] as the sponsor[,]" he admits that they "had to be somewhat severe[,]" and "the one thing [he] remember[s] about [Branch's presentation] is that it didn't land incredibly well." [*Id.* at pp. 59:5–7, 15–17; 74:2–4]. Bottom line, inevitable discussions were fast approaching to address Navicent's ongoing struggles. [Doc. 60-1, Taylor Decl., ¶ 8].

## I.     Additional Resources are Needed from Navicent

On July 16, 2018, these discussions began to surface. [Doc. 51-12, p. 1]. Initially contained just to Navicent and GE Healthcare leadership, they were related to

"potential redesign efforts" for Navicent's process improvement team and "where it lands within the organization." [*Id.* at pp. 1, 3]. "Consistent with the [three-year strategic] plan[] and what [had been] shared with [Sessley] and [Branch] over the past [six] months," Taylor stressed that "[three] things needed to happen to turbo-charge [process improvement] efforts across [Navicent.]" [*Id.* at p. 2]. The only relevant change here, of course, would be Taylor's position that Navicent needed two more full-time Black Belts in addition to Branch serving as the Master Black Belt. [*Id.*]; [Doc. 62-1, ¶ 43]. "[T]he reality" of this whole situation is that when it came to "getting the job done [well]" and "on time," that wasn't happening with just Branch as the only person for process improvement—they needed "three to five . . . people" in that area. [Doc. 53, Martin Depo., p. 64:10–13]. In other words, "Branch's performance issues had more to do with [the joint process improvement initiative] being behind and needing more resources from Navicent to get the job done." [*Id.* at p. 67:3–6]; [Doc. 62-1, ¶ 66]. So, in mid-2018, GE Healthcare's concerns related to staffing and performance with Navicent's Horizon 1 Continuous Improvement team turned into discussions about hiring additional Black Belts or Navicent allocating additional recourses to the joint efforts for process improvement. [Doc. 62-1, ¶¶ 42, 68].

**J.      Branch Applies for Leave Under the Family Medical Leave Act**

On August 14, 2018, Sessley copied Cornue on an email that he sent to Jones in human resources asking how "[they] might setup [*sic*] FMLA [leave] for Yvette Branch."

[Doc. 51-4, p. 1]. Just a few hours later, Jones responded to both Sessley and Cornue and advised them that Navicent "outsource[s] the administration of [its] [family/medical leave] to The Hartford." [*Id.*]. Sessley testified that he communicated this information to Branch, but he doesn't know whether it was via email or in person. [Doc. 51, Sessley Depo., pp. 33:24—34:14]. Nevertheless, in the time between when she first inquired about FMLA leave in early July 2018 to when Sessley emailed Jones in mid-August 2018, Branch testified that she had already figured out how to apply for and receive FMLA leave by doing her own research on Navicent's internal website for human resources. [Doc. 57, Branch Depo., p. 105:5–17]; [Doc. 51-3, p. 1]; [Doc. 62-1, ¶ 70]. Regardless of how she learned to do it, Branch submitted a leave of absence request to The Hartford, and on August 14, 2018, The Hartford informed her that she was "eligible" for intermittent leave from September 14, 2018, through September 13, 2019. [Doc. 57-18, p. 1]. And while he doesn't recall seeing it, Sessley likewise received an email on August 14, 2018, noting "Hartford Eligibility" for "Branch, Yvette." [Doc. 51, Sessley Depo., pp. 35:13—36:9]; [Doc. 51-5, p. 1]. Although it's relatively clear that Sessley knew of Branch's request for FMLA leave and that he likely knew of its approval, Branch doesn't remember Sessley ever having any negative reaction or making any negative comment about it. [Doc. 62-1, ¶¶ 72–73]. But what about Dr. Saunders? Branch never discussed her FMLA leave request or told Dr. Saunders that she needed FMLA leave to care for her father. [*Id.* at ¶ 76]. So, according to Dr.

Saunders, she wasn't even aware that Branch had applied. [*Id.* at ¶ 77].

### K.    The Redesign of Navicent's Process Improvement Team

Two days later, on August 16, 2018, the Strategic Execution Steering Committee

for the Navicent-GE Healthcare partnership held a meeting to discuss the redesign and

needs for Navicent's Horizon 1 Continuous Improvement team. [*Id.* at ¶ 81]. There is no

evidence that Branch's FMLA leave request was mentioned at that meeting. [*Id.*]. Then,

on September 11, 2018, Branch submitted a "Certification of Health Care Provider" form

to The Hartford for her "[f]amily [m]ember's [s]erious [h]ealth [c]ondition," but, on

September 14, 2018, The Hartford informed her that it was incomplete. [*Id.* at ¶¶ 82, 84];

[Doc. 57-20, pp. 1–3]. Meanwhile, on September 12, 2018, the Governance Committee for

the partnership—a committee comprised of key Navicent and GE Healthcare

stakeholders—met and continued to discuss the plans for Navicent's Horizon 1

Continuous Improvement team, but again, nothing was said about Branch's FMLA

leave request at this meeting either. [Doc. 62-1, ¶¶ 83, 88].

In its initial stages, the proposed redesign considered moving Branch's position

from under Sessley and the CfDI to underneath Quality. [*Id.* at ¶¶ 9–10, 85]. At the time

of this proposal's approval, Branch admitted that she wasn't present, but her testimony

makes it clear that she was aware of the potential changes to her department. [*Id.* at ¶

86]; [Doc. 57, Branch Depo., pp. 238:18—240:15]. Then, on September 13, 2018, Dr.

Saunders approved the proposed redesign that would have Branch and two additional

Black Belts reporting to Dr. Reg Gilbreath, the head of Quality for Navicent. [*Id.* at ¶¶ 62, 85–86]; [Doc. 49, Saunders Depo., p. 57:8–11].

**L.      The Governance Committee's September 2018 Quarterly Meeting**

On September 18, 2018, the Governance Committee held its quarterly meeting, and the only attendees present were Dr. Saunders; Martin; Stacy Ziglar, an Executive Program Manager from GE Healthcare who prepared the minutes; Dr. Tom Oliver; Mike Esposito; Chris Wilde; Kathy Bowen; Helen Stewart; and Semhal Araya. [*Id.* at ¶¶ 87, 89–90]. Importantly, no one in attendance mentioned or discussed Branch's FMLA leave. [*Id.* at ¶ 83]. Sessley wasn't a member of the Governance Committee, and as you can see from the list of attendees, he didn't attend its quarterly meeting. [*Id.* at ¶ 131].

During this meeting, Navicent contends that the Governance Committee decided for Navicent to hire two new Black Belts who would report to Dr. Gilbreath but that the Master Black Belt position, moving forward, would be eliminated from its organizational structure. [*Id.* at ¶ 91]. Branch, however, relying on Martin's perspective that GE Healthcare wasn't in the partnership to act as a "hatchet crew" and slash positions from within Navicent, vehemently disputes that anyone from GE Healthcare on the Governance Committee had any sway in its decision to eliminate her position. [Doc. 53, Martin Depo., p. 107:2–13]. In other words, from Branch's standpoint, it had to be someone from Navicent.

Although Martin testified that there wasn't "anything in any of [the] project's

17

plans" indicating a need for a Master Black Belt and that, to be successful, the Navicent-GE Healthcare partnership really just "need[ed] process improvement resources," he was likewise just as clear that in terms of whether Navicent would cease employing a Master Black Belt altogether, GE Healthcare didn't "get involved in that level of detail." [*Id.* at pp. 95:14—96:9; 105:12–21]. Despite his thoughts about what needed to occur in order to propel the Navicent-GE Healthcare partnership forward, Martin enforced again and again that he didn't recommend the elimination of the Master Black Belt role and that to his knowledge, no one else from GE Healthcare would have either. [*Id.* at p. 106:5–11]. Yet, there's Cornue who testified "[t]hat [it was his] understanding" "that the decision to eliminate the Master Black Belt position was based on a recommendation of GE [Healthcare]." [Doc. 55, Cornue Depo., p. 72:10–14]. Cornue, though, wasn't at the Governance Committee's quarterly meeting either, nor was he involved in any discussions concerning the elimination of the Master Black Belt position. [*Id.* at pp. 85:23—84:7]. He only remembers being "told that the position was being eliminated." [*Id.* at p. 86:8–12].

So, who among our cast of characters might be able to divulge whether a Navicent Governance Committee member decided to remove the Master Black Belt role? Logically, that would be Dr. Saunders, but according to her testimony, she had a completely different understanding altogether. She thought a different course of action was in the works—the restructuring plan that she had approved to move Branch and

two additional Black Belts to underneath Quality with Dr. Reg Gilbreath. [Doc. 62-1, ¶¶ 62, 85]; [Doc. 51-14, p. 1]. Notwithstanding the fact that she was Navicent's Chief Executive Officer at the time and a member of the Governance Committee, Dr. Saunders testified that she "wouldn't know" what changed between her approved plan and the decision that led to the elimination of the Master Black Belt position. [Doc. 62-1, ¶¶ 14, 62, 85–86]; [Doc. 49, Saunders Depo., p. 57:17–24]; *see also* [Doc. 49-1, p. 1 (email from Cornue to Dr. Saunders on September 20, 2018, stating that Sessley, Jones, and Gina "are moving forward with Yvette, with action expected in the next 24 hours")]. Suffice it to say, when it comes to GE Healthcare's involvement, neither Dr. Saunders nor Martin recall any discussions of GE Healthcare personnel recommending that Branch's position be cut. [Doc. 49, Saunders Depo., pp. 57:25—58:3]; [Doc. 53, Martin Depo., p. 106:5–11].

Again, Navicent contends that the Governance Committee made the decision to hire two additional Black Belts at its quarterly meeting held on September 18, 2018. [Doc. 62-1, ¶ 91]. But it also contends that "for some time" "[w]ell prior to September 2018" (likely in July 2018) that it had "already been trying to hire additional Black Belts" with different responsibilities from the Master Black Belt position. *Compare* [Doc. 61, ¶¶ 91–92] *with* [Doc. 61, ¶ 95]; [Doc. 62-1, ¶ 95 (citing [Doc. 61, ¶¶ 91–92])]; [Doc. 57, Branch Depo., p. 248:1–19]; [Doc. 49, Saunders Depo., p. 40:13–21]. Well, which is it? Regardless of when Navicent actually made this decision, it contends that it was unrelated to "the decision to eliminate the Master Black Belt position or the resulting termination of

Branch." *Compare* [Doc. 61, ¶¶ 91–92] *with* [Doc. 61, ¶ 95].

While it's certainly hazy as to whether Navicent even knows when it made the decision to hire additional Black Belts and eliminated Branch's position, what we do know, based on this record, is this: no one from GE Healthcare had anything to do with the recommendation to altogether eliminate it; that neither Sessley nor Cornue attended the Governance Committee's quarterly meeting on September 18, 2018; that the issue of Branch needing or requesting FMLA leave nor her father's medical condition or his need for care ever came up at the quarterly meeting or any other communication during the Navicent-GE Healthcare partnership; and that Dr. Saunders "wouldn't know" what changed to cause the Master Black Belt position to be completely eliminated instead of moved to underneath Dr. Gilbreath. [Doc. 62-1, ¶¶ 96–99]; [Doc. 49, Saunders Depo., p. 57:17–24]. Someone though, if it wasn't Dr. Saunders via her role in the Governance Committee, had to make the decision to get rid of the Master Black Belt position. But who was it? This question, of course, brings us to pondering what Sessley and Cornue knew despite the fact that they weren't a part of the Governance Committee or even at its quarterly meeting.

## M.   <u>Sessley and Cornue's Communications</u>

On September 19, 2018, one week after Dr. Saunders approved the redesign that would've moved Branch from Sessley to underneath Quality with Dr. Gilbreath, Cornue sent a text message to Sessley that reads: "We have to move forward with

Yvette and not move her over to [Dr. Gilbreath]. Call me if you want to discuss—you

may want to chat with Paula again to make sure we have the right process in place."

[Doc. 55, Cornue Depo., pp. 70:20—71:3]; [Doc. 51, Sessley Depo., pp. 105:13—106:10];

[Doc. 55-11, pp. 1–2]; [Doc. 51-15, pp. 1–3]. When he received the text message, though,

Sessley testified that he wasn't aware that the Master Black Belt position had been

eliminated, but he did understand that Branch wasn't going to be moved to underneath

Dr. Gilbreath. [Doc. 51, Sessley Depo., pp. 108:15—113:8]. "[I]n terms of the position

being eliminated[,]" "[n]othing explicit had been done or made knowledgeable to

[Sessley]," and neither he nor Cornue can definitively say whether the decision to

eliminate the Master Black Belt position coincided with Branch's termination. [*Id.* at pp.

123:23—124:17]; [Doc. 55, Cornue Depo., pp. 70:20—71:13]. All Cornue could say was

that it was "[his] understanding" that the recommendation to remove that role came

from GE Healthcare, and in Sessley's view—notwithstanding Martin's testimony to the

contrary—a recommendation like that, from his experience, made sense. [Doc. 55,

Cornue Depo., p. 72:10–14]; [Doc. 51, Sessley Depo., p. 130:2–17]; [Doc. 53, Martin

Depo., p. 107:2–13].

### N.    **The Hartford Approves Branch's FMLA Request**

Once The Hartford received a complete "Certification of Health Care Provider"

form from Branch, it notified her on September 20, 2018, that it approved her request for

intermittent FMLA leave from September 14, 2018, through September 13, 2019. [Doc.

62-1, ¶ 105]. Branch received the exact leave she requested, and all she had to do was contact The Hartford and "report each date and time" an absence from work related to her intermittent leave. [*Id.* at ¶¶ 106–07]. But, she didn't use any of it. [*Id.* at ¶ 108].

### O.     Branch's Termination

Within days of The Hartford approving Branch's FMLA leave, Navicent contends that it inadvertently posted a vacant position for a "Black Belt" job opening under code "WA97"—the job code for the "Master Black Belt" position. [Doc. 47-6, Harrelson Decl., ¶¶ 3, 5]. Tracey Harrelson, who was, at the time, Navicent's Talent Acquisition Manager, noticed the incorrect coding and worked to correct the job posting so that it contained the correct job code for a "Black Belt" position—"WA74". [*Id.* at ¶¶ 2, 4–5]. Branch, though, says that this job posting was *her* job. [Doc. 57, Branch Depo., pp. 234:17–21; 279:5–17]. According to her, the job descriptions that Navicent posted for a "WA97" coding and a "WA74" coding had no differences save for the omission of the word "Master." [*Id.* at pp. 234:18–21]; [Doc. 62-1, ¶¶ 95, 109].

On September 26, 2018, a mere six days after The Hartford approved Branch's request for intermittent FMLA leave, she attended a meeting with Sessley and Jones where "she was notified that her employment was being terminated." [Doc. 62-1, ¶ 111]. Not a word was said about Branch's FMLA leave or her father's medical condition during this meeting, and according to her, Sessley said that she was being let go because of organizational changes made based on recommendations from GE

Healthcare and that the decision came "from up top" and Dr. Saunders. [*Id.* at ¶¶ 112, 114–15]. Importantly, Branch admits that "Sessley did not tell her that it was his decision to terminate her[,]" but when asked whether he told Branch "that the decision to fire her came from Dr. Saunders[,]" he could "recall nothing of that sort." [*Id.* at ¶ 128]; [Doc. 51, Sessley Depo., p. 102:1–3]. From what Sessley can recall, though, Navicent didn't offer Branch the available Black Belt position, but candidly, she didn't apply for it. [Doc. 51, Sessley Depo., p. 139:22–24]; [Doc. 57, Branch Depo., p. 284:20–21]. Finally, while this seems like a minuscule fact set against such a protracted factual backdrop, Navicent represented to the Georgia Department of Labor that Branch was terminated due to "lack of work." [Doc. 62-5, p. 1].

### P.   So, Whodunnit?

There is no doubt that the underlying facts of this case are layered and, at times, unclear. Perhaps that is why no one is able to pinpoint not only *when* or *how* or *why* the decision to eliminate the Master Black Belt position came about and in turn terminate Branch but, more importantly, *who* really made those decisions. Although Sessley testified that he personally had "no problem" with her termination, he also made it abundantly clear that her termination and the decision to eliminate the Master Black Belt position "happened outside the scope of his decision-making authority" without "any opportunity [for him] to agree or object[.]" [Doc. 62-1, ¶ 129]; [Doc. 51, Sessley Depo., pp. 122:11–16; 125:1–3, 9–12]. Other than the fact that Sessley acted as Branch's

manager and supervisor and was present in the room when she was terminated, Branch testified that she has no other evidence that he was involved in the decision to terminate her employment. [Doc. 62-1, ¶ 135]; [Doc. 57, Branch Depo., p. 230:2–18]; [Doc. 51, Sessley Depo., p. 100:11–20]. Same goes for Cornue. He can't recall the missing puzzle pieces either. Somebody communicated the fate of the Master Black Belt position to him, he just can't recall who is was. He doesn't know if it was Dr. Saunders, and he doesn't know if it was someone from GE Healthcare. [Doc. 55, Cornue Depo., pp. 72:10–14; 72:19—73:17].

All Branch could say when it came to her "firsthand knowledge" as to *who* made the call was that Sessley told her that Dr. Saunders "made the final decision." [Doc. 57, Branch Depo., pp. 229:3–7; 229:25—230:1]. But, according to Dr. Saunders, she's just as in the dark as everyone else as to when, how, or why the decision to eliminate the Master Black Belt position was made. And, by that same token, based on this record, she's also in the dark when it comes Branch's termination and Whodunnit? *See, e.g.*, [Doc. 49, Saunders Depo., pp. 45:18—46:18; 57:17—58:7]; [Doc. 62-1, ¶ 132].

To sum it up, no one seems to remember anything. In contemporary corporate parlance, apparently Navicent is just too big to recall.

## DISCUSSION

### A.   Legal Standard

A court must grant summary judgment "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).

A factual dispute is not genuine unless, based on the evidence presented, "'a reasonable jury could return a verdict for the nonmoving party.'" *Info. Sys. & Networks Corp. v. City of Atlanta*, 281 F.3d 1220, 1224 (11th Cir. 2002) (quoting *United States v. Four Parcels of Real Prop.*, 941 F.2d 1428, 1437 (11th Cir. 1991)); *see also Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). "The moving party bears the initial responsibility of informing the court of the basis for its motion." *Four Parcels*, 941 F.2d at 1437. The movant may cite to particular parts of materials in the record, including, "'the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any,' which it believes demonstrate the absence of a genuine issue of material fact." *Id.* (quoting *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986)); Fed. R. Civ. P. 56(c)(1)(A).[3] "When the nonmoving party has the burden of proof at trial, the moving party is not required to 'support its motion with affidavits or other similar material negating the opponent's claim[]' in order to discharge this 'initial responsibility.'" *Four Parcels*, 941 F.2d at 1437–38 (quoting *Celotex*, 477 U.S. at 323). Rather, "the moving party

---

[3] Courts may consider all materials in the record, not just those cited by the parties. Fed. R. Civ. P. 56(c)(3).

simply may show—that is, point out to the district court—that there is an absence of evidence to support the nonmoving party's case." *Four Parcels*, 941 F.2d at 1437–38 (quoting *Celotex*, 477 U.S. at 324) (cleaned up). Alternatively, the movant may provide "affirmative evidence demonstrating that the nonmoving party will be unable to prove its case at trial." *Id.*

If this initial burden is satisfied, the burden then shifts to the nonmoving party, who must rebut the movant's showing "by producing . . . relevant and admissible evidence beyond the pleadings." *Josendis v. Wall to Wall Residence Repairs, Inc.*, 662 F.3d 1292, 1315 (11th Cir. 2011) (citing *Celotex*, 477 U.S. at 324). The nonmoving party does not satisfy its burden "if the rebuttal evidence 'is merely colorable or[] is not significantly probative' of a disputed fact." *Josendis*, 662 F.3d at 1315 (quoting *Anderson*, 477 U.S. at 249–50). "A mere scintilla of evidence supporting the [nonmoving] party's position will not suffice." *Allen v. Tyson Foods, Inc.*, 121 F.3d 642, 646 (11th Cir. 1997).

Further, where a party fails to address another party's assertion of fact as required by Federal Rule of Civil Procedure 56(c), the Court may consider the fact undisputed for purposes of the motion. Fed. R. Civ. P. 56(e)(2). However, "credibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge. *Anderson*, 477 U.S. at 255. Succinctly put,

> [s]ummary judgment is not a time for fact-finding; that task is reserved for trial. Rather, on summary judgment, the district court must accept as fact

> all allegations the [nonmoving] party makes, provided they are sufficiently supported by evidence of record. So[,] when competing narratives emerge on key events, courts are not at liberty to pick which side they think is more credible. Indeed, if "the only issue is one of credibility," the issue is factual, and a court cannot grant summary judgment.

*Sconiers v. Lockhart*, 946 F.3d 1256, 1263 (11th Cir. 2020) (internal citations omitted). Stated differently, "the judge's function is not himself to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." *Anderson*, 477 U.S. at 249. "The evidence of the [nonmovant] is to be believed, and all justifiable inferences are to be drawn in his favor." *Id.* at 255. And "if a reasonable jury could make more than one inference from the facts, and one of those permissible inferences creates a genuine issue of material fact, a court cannot grant summary judgment"; it "must hold a trial to get to the bottom of the matter." *Sconiers*, 946 F.3d at 1263.

### B.   Branch's FMLA-Related Claims Against Navicent and Sessley

Some of the Congressional purposes in enacting the FMLA were "to balance the demands of the workplace with the needs of families, to promote the stability of economic security of families, and to promote national interests in preserving family integrity." 29 U.S.C. § 2601(b). Under the FMLA, eligible employees are guaranteed up "to a total of 12 workweeks of leave during any 12-month period" for several reasons. 29 U.S.C. § 2612(a)(1). This leave doesn't have to be taken all at once. It can be taken intermittently—that is, "in separate blocks of time due to a single qualifying reason."

*Diamond v. Hospice of Fla. Keys, Inc.*, 677 F. App'x 586, 592 (11th Cir. 2017); *see also* 29

U.S.C. § 2612(b)(1). Branch, of course, obtained FMLA leave on an intermittent basis in

order to care for her father's "serious health condition." *See* 29 U.S.C. § 2612(a)(1)(C);

[Doc. 57-18, p. 1].

     To preserve and enforce rights guaranteed by the FMLA, the Eleventh Circuit

recognizes that it creates two types of claims. *Jones v. Gulf Coast Health Care of Del., LLC*,

854 F.3d 1261, 1267 (11th Cir. 2017 (quoting *Strickland v. Water Works & Sewer Bd. of City*

*of Birmingham*, 239 F.3d 1199, 1206 (11th Cir. 2001)). First, there are interference claims

where an employee asserts that her employer denied or otherwise interfered with her

substantive FMLA rights. *Id.*; *see also* 29 U.S.C. § 2615(a). Second, there are retaliation

claims in which an employee asserts that her employer discriminated against her

because she engaged in activity protected by the FMLA. *Jones*, 854 F.3d at 1267 (quoting

*Strickland*, 239 F.3d at 1206); *see also* 29 U.S.C. § 2615(b); 29 C.F.R. § 825.220.

     As a result of her termination, Branch initially asserted three claims against

Navicent. [Doc. 1, pp. 11–14]. However, as can be readily deduced from Navicent's and

Sessley's[4] Motion for Summary Judgment [Doc. 47] and Branch's Response [Doc. 62] in

which she withdraws her claim for association discrimination under the Americans

with Disabilities Act, 42 U.S.C. § 12112(b)(4), there are only two claims facing summary

---

[4] Branch's claims are asserted against both Navicent *and* Sessley. However, for purely stylistic reasons, the Court uses "Navicent" to collectively refer to the two remaining defendants.

judgment: Branch's FMLA interference claim and her FMLA retaliation claim.[5] [Doc. 1, pp. 12–14]; [Doc. 62, p. 5 n.3]. Let's start with retaliation.

### 1.    Retaliation Under the FMLA

To succeed on a retaliation claim in the FMLA context, Branch must demonstrate that Navicent "intentionally discriminated against [her] in the form of an adverse employment action for having exercised an FMLA right." *Jones*, 854 F.3d at 1270 (quoting *Strickland*, 239 F.3d at 1207); [Doc. 47-1, p. 19]. Simply put, she has to show that Navicent's actions "were motivated by an impermissible retaliatory . . . animus." *Id.* Branch admits that no one at Navicent ever said anything negative about her father's medical condition or ever mentioned her FMLA leave as a reason for her termination. [Doc. 62-1, ¶¶ 27, 114]. So, she doesn't have any direct evidence that "reflects a . . . retaliatory attitude correlating to" the complained-of retaliation. *Jones*, 854 F.3d at 1270 (quoting *Wilson v. B/E Aerospace, Inc.*, 376 F.3d 1079, 1086 (11th Cir. 2004)). For it is "only

---

[5] Too often, bad lawyering gives judges the opportunity to criticize and complain about needless claims and meritless positions that lesser lawyers stubbornly cling to, only adding to a court's already-heavy docket. Courts, of course, are right to criticize when it's called for, but we're also just as right to praise when it's warranted. Notwithstanding countless efforts and exhortations to lawyers to be more professional, courts (including this judge) routinely fail to highlight and praise exceptional professionalism when we see it.

In its brief, Navicent first attacked Branch's claim for association discrimination. [Doc. 47-1, pp. 9–19]. Navicent presented a well-reasoned and thorough analysis, detailing the relevant facts as well as the legal positions of why Branch's claim for association discrimination should fail. The Court knows it is never easy to concede that a claim cannot stand under the current state of the law or under the facts of a given case, but, as lawyers, we are required to do just that. Branch's withdrawal of her claim for association discrimination from this factually intricate case is without a doubt one of those instances of commendable professionalism worth noting.

the most blatant remarks, whose intent could mean nothing other than to discriminate on the basis of some impermissible factor [that] constitute direct evidence[.]"[6] *Id.*

### a.    *McDonnell Douglas Framework*

Without direct evidence, Branch's retaliation claim funnels into the circumstantial-evidence route and an analysis under the burden-shifting framework established by the Supreme Court in *McDonnell Douglas Corporation v. Green*, 411 U.S. 792 (1973). *Jones*, 854 F.3d at 1271 (citing *Schaaf v. Smithkline Beecham Corp.*, 602 F.3d 1236, 1243 (11th Cir. 2010)). While there are countless cases within and outside the Eleventh Circuit that lay out this burden-shifting framework, the Court need not look any further than the Eleventh Circuit's opinion in *Jones* to discern the applicable law. *Jones* states that "[u]nder the *McDonnell Douglas* framework," Branch "must first establish a prima facie case[.]" 854 F.3d at 1271. Prima facie cases for workplace retaliation are generally created when an employee engages in statutorily protected activity, suffers an adverse employment decision, and can demonstrate that the adverse employment decision was causally related to the protected activity. *Id.* (quoting *Schaaf*, 602 F.3d at 1243); *see also Gogel v. Kia Motors Mfg. of Ga., Inc.*, 967 F.3d 1121, 1134 (11th Cir. 2020) (en banc).

If Branch establishes a prima facie case, there is an automatic presumption that

---

[6] Branch's arguments in opposing Navicent's summary-judgment efforts make clear that she isn't relying on any sort of direct evidence to prove her FMLA retaliation claim. *See, e.g.,* [Doc. 62, pp. 6–7].

Navicent's adverse employment decision was the product of its intent to unlawfully retaliate against her. *Combs v. Plantation Patterns*, 106 F.3d 1519, 1528 (11th Cir. 1997) (quoting *Texas Dep't of Cmty. Affairs v. Burdine*, 450 U.S. 248, 254 (1981)) ("Establishment of the prima facie case in effect creates a presumption that the employer unlawfully [retaliated] against the employee."). At that point, the burden shifts to Navicent to "articulate a legitimate, nondiscriminatory reason" for Branch's termination. *Jones*, 854 F.3d at 1271 (citing *Schaaf*, 602 F.3d at 1243). Finally, if Navicent is able to meet this burden, then the burden bounces back to Branch who must show that Navicent's supposedly legitimate reason was in fact a pretext designed to mask illegal discrimination. *Jones*, 854 F.3d at 1271 (citing *Schaaf*, 602 F.3d at 1244).

On to the first burden: Can Branch establish her prima facie case? Branch admits that her "FMLA leave request was granted in full and that she was given the exact leave she was requesting[,]" but just six days after that, Navicent fired her. [Doc. 62-1, ¶ 106]. Since the record demonstrates, unquestionably so, that Branch's intermittent FMLA leave comprises statutorily protected activity and that her termination constitutes an adverse employment decision, Navicent had no legitimate basis to quarrel with whether she satisfies the first two elements of a prima facie case. *See Jones*, 854 F.3d at 1271 (quoting *Schaaf*, 602 F.3d at 1243); [Doc. 47-1, p. 20]. In another notable example of attorney professionalism, Navicent jumps directly to the third element of Branch's prima facie case, but here, it contends that she cannot demonstrate that her termination

31

was causally related or connected to activity protected by the FMLA. [Doc. 47-1, p. 20]; *see also Jones*, 854 F.3d at 1271 (quoting *Schaaf*, 602 F.3d at 1243).

"Close temporal proximity between protected conduct and an adverse employment action is generally 'sufficient circumstantial evidence to create a genuine issue of material fact of a causal connection.'" *Hulbert v. St. Mary's Health Care Sys., Inc.*, 439 F.3d 1286, 1298 (11th Cir. 2006). Here, the proximity between Branch's leave eligibility and her termination is about as close as you can get. Six days.[7]

Branch argues that she can use this undeniably close temporal proximity to establish the third element of her prima facie case. [Doc. 62, p. 7]. Relying on *Vira v. Crowley Liner Services, Inc.*, she contends that she *may* depend on the close temporal proximity between the two events at the prima facie stage "[t]o prove the decision was causally related to the protected activity[.]" 723 F. App'x 888, 893 (11th Cir. 2018) (citing *Hulbert*, 439 F.3d at 1298). However, when you read further in *Hulbert*, it notes an exception to rather-blanket dependence on *just* close temporal proximity. 439 F.3d at 1298. The exception, as Navicent notes, "applies where there is 'unrebutted evidence that the *decision maker* did not have knowledge that the employee engaged in protected conduct[.]" *Id.* (emphasis added); [Doc. 47-1, p. 20]. In other words, temporal proximity *alone* is insufficient to establish a causal connection "when there is unrebutted evidence

---

[7] "[A] few days is sufficient for a causal connection[]"; however, "a few months is not." *Vira v. Crowley Liner Services, Inc.*, 723 F. App'x 888, 893 (11th Cir. 2018) (citations omitted).

that the decision maker was not aware of the protected activity." *Krutzig v. Plute Home Corp.*, 602 F.3d 1231, 1235 (11th Cir. 2010) (citation omitted) (emphasis added).

Branch undoubtedly recognizes this exception. Directing the Court to *Munoz v. Selig Enterprises, Inc.*, she knows that to show a causal connection, she "must ultimately prove that 'the [decision makers] were aware of the protected conduct[] and that the protected activity and the adverse action *were not wholly unrelated*.'" [Doc. 62, p. 6, (quoting 981 F.3d 1265, 1277 (11th Cir. 2020) (citation omitted))]. Clearly, the focus here has to be on what a "decision maker" knew.

"Sometime around June or July 2018," Navicent admits that "Branch told Sessley that she needed FMLA leave and asked that he share with her information on the FMLA process." [Doc. 61, ¶ 51]. Then, after being told that it was "best [to] start with Clint Jones[,]" Sessley sent him an email asking how "[they] might setup [*sic*]" her FMLA leave. [Doc. 51, Sessley Depo., p. 31:2–16, 22–23]; [Doc. 51-4, p. 1]. And remember, Sessley copied Cornue on that email. [Doc. 51-4, p. 1]. So, off hand—Jones, from human resources; Sessley, Branch's direct supervisor; and Cornue, Sessley's direct supervisor all knew about Branch *needing* or *wanting* to request FMLA leave, but it was only Branch, via letter, and Sessley, via email, who were notified that she was *eligible* to take intermittent leave. [Doc. 51-5, p. 1]; [Doc. 57-21]. Sessley, though, "do[es]n't recall" receiving that email. [Doc. 51, Sessley Depo., p. 36:3–9]. Regardless of whether Sessley can recall receiving it, he apparently wasn't a "decision maker" (as contemplated by

*Munoz*) when it came to whether Branch was going to stay or go since that type of decision was "outside the scope of his decision-making authority." 981 F.3d at 1277; [Doc. 62-1, ¶ 129]. Branch's testimony doesn't necessarily discredit this because she claims that Sessley told her that the decision came "from up top" *and* Dr. Saunders. [Doc. 62-1, ¶ 112]. The only person in this cast of Navicent characters, aside from Dr. Saunders, of course, who is "higher" than Sessley, is Cornue. But—Branch admits—when it comes to her being notified that she was eligible for leave, "[i]t is unknown whether [that] information was forwarded to Cornue." [*Id.* at ¶ 80]. So, after whittling down the list, the only person that remains is Dr. Saunders.

This is where, despite this relatively dense record, a huge factual gap appears. When you closely examine Dr. Saunder's testimony, it's entirely unclear as to how Branch went from Navicent's Master Black Belt to looking for employment. If Sessley told Branch that the decision came "from up top" *and* Dr. Saunders, why "wouldn't [Dr. Saunders] know" what changed between her approval to move Branch to underneath Quality with Dr. Gilbreath and *someone*—not Dr. Saunders, obviously—from Navicent all of a sudden eighty-sixing Branch's position? [*Id.* at ¶¶ 14, 62, 85–86, 112]; [Doc. 49, Saunders Depo., p. 57:17–24]; [Doc. 51-14, p. 1 (email from Dr. Gilbreth stating "Dr[.] S[aunders] stated [Branch] would support [*sic*] (now) directly to me.")]. Moreover, who else could "from up top" be? Nobody from Navicent could definitively say.

The record is clear, however, that Sessley was the person who actually told

Branch she was fired, but according to him, that was the full extent of his involvement. [Doc. 51, Sessley Depo., p. 100:11–20]; [Doc. 62-1, ¶¶ 129–30]. Thus, it appears that Sessley was merely a messenger.[8] Thing is, though, he can't recall for whom. He doesn't recall it being Dr. Saunders, and she thought that Cornue would've made the decision to eliminate Branch's position as part of Navicent's restructuring efforts. *See, e.g.*, [Doc. 51, Sessley Depo., p. 102:1–3]; [Doc. 49, Saunders Depo., pp. 21:24—22:10]. Cornue, though, testified that it was his understanding that "the decision to eliminate the Master Black Belt position was based on a recommendation of GE [Healthcare]." [Doc. 55, Cornue Depo., p. 72:10–14]. But again, Martin was clear that he certainly didn't recommend that the Master Black Belt role be eliminated, and to his knowledge, no one from GE Healthcare ever made that recommendation. [Doc. 53, Martin Depo., p. 106:5–11]. All of this is . . . puzzling, to say the least.

---

[8] Branch names Sessley as an individual defendant. [Doc. 1, p. 1]. However, Sessley argues that he is entitled to summary judgment on her claims against him, primarily on the ground that he is not an "employer" subject to liability under the FMLA. "Under the FMLA, only a worker's employer is liable for interfering with FMLA rights or retaliating against those who seek to use those rights or complain of such interference." *Phifer v. Hyundai Power Transformers USA*, 522 F. Supp. 3d 1102, 1113 (M.D. Ala. 2021). The Eleventh Circuit, looking to terms within the Fair Labor Standards Act, 29 U.S.C. § 203(d), has held that an individual may qualify as an "employer" if he or she "ha[s] some direct responsibility for the supervision of the employee" who has sued. *Id.* (quoting *Alvarez Perez v. Sanford-Orlando Kennel Club, Inc.*, 515 F.3d 1150, 1160 (11th Cir. 2008)). Direct responsibility is important because "it tends to show 'the supervisor's role in causing the [FMLA] violation,' which is the primary focus of the inquiry." *Phifer*, 522 F. Supp. 3d at 1113 (quoting *Lamonica v. Safe Hurricane Shutters, Inc.*, 711 F.3d 1299, 1314 (11th Cir. 2013)). Thus, whether Sessley qualifies as Branch's employer "does not depend on technical or 'isolated factors but rather on the circumstances of the whole activity.'" *Phifer*, 522 F. Supp. 3d at 1113 (quoting *Alvarez Perez*, 515 F.3d at 1160). Even though there is some evidence that Sessley told Branch she was fired "at the direction of" someone else, too many factual determinations remain and preclude summary judgment on Branch's claims against Sessley. *Phifer*, 522 F. Supp. 3d at 1113; [Doc. 62, pp. 23–25].

Now, even if Dr. Saunders or Cornue, individually, or both of them together, hypothetically and with no stated reason, told Sessley, "Go fire Yvette, right now," Branch admits that "she does not have any evidence . . . that Dr. Saunders was aware of [her] request for FMLA leave." [Doc. 62-1, ¶ 78]; [Doc. 57, Branch Depo., p. 188:17–20]. And, although he knew about her request for leave, Cornue's in a similar boat. [Doc. 51-4, p. 1]. Branch admits that "[i]t is unknown whether" her leave eligibility "was forwarded to Cornue." [Doc. 62-1, ¶ 80]. The lack of evidence as to their knowledge is critical because what Sessley knew cannot be imputed to Dr. Saunders or to Cornue. "[K]nowledge on the part of persons other than a decision maker cannot be imputed from other supervisors to the decision maker for purposes of an FMLA retaliation claim." *Krutzig*, 602 F.3d at 1235. Plain and simple. Without any evidence that Dr. Saunders or Cornue knew anything about Branch's FMLA leave eligibility, Branch cannot demonstrate that any decision maker (assuming, but certainly not deciding, that Cornue and Dr. Saunders stand in the decision-maker spotlight) was aware of her statutorily protected conduct. *Munoz*, 981 F.3d at 1277. Thus, from the perspective of what a *decision maker* knew, Branch's FMLA leave and her termination appear to be wholly unrelated.

But, if you think about it, Branch isn't as lucky as the plaintiffs in *Hulbert, Vira, Krutzig,* or *Munoz.* They all had something she doesn't. In those cases, it was discernable—or at the very least, suggested—from the summary-judgment evidence

who the decision maker was. *See, e.g.*, *Hulbert*, 439 F.3d at 1298 ("The summary[-] judgment evidence, when considered in the light most favorable to Hurlbert, suggests that Jeff Sosby, Bonnie Butler, and Jeff English were all involved in the decision to terminate Hurlbert."). Branch's inability to point to similar evidence on her record isn't a situation where her lawyers failed to ask the right questions—not by a long shot. Sure, applying what the Court views as a very strict application of the exception to the rule— that an employee can't rely on temporal proximity alone in light of "unrebutted evidence that [a] decision maker did not have knowledge that the employee engaged in protected conduct[]"—Branch can't make a prima facie case to the hilt. *See id.*; *Krutzig*, 602 F.3d at 1235; *cf. McAlpin v. Town of Sneads*, --- F.4th ----, 2023 WL 2336456, at *11 (11th Cir. Mar. 3, 2023) (discussing that a prima facie case can be made using "only" temporal proximity and assuming employee "established a prima facie case for FMLA retaliation for purposes of summary judgment[]").

Stripped of court-speak, she can't show that a decision maker knew about her request or eligibility for FMLA leave. But, Branch's evidentiary conundrum is due to Navicent's anonymous, amorphous, and shape-shifting reasons in its efforts to meet its burden under *McDonnell Douglas* to "articulate a legitimate, nondiscriminatory reason" for firing her. *Jones*, 854 F.3d at 1271 (citing *Schaaf*, 602 F.3d at 1243). So, there has to be some other way to figure out whether Navicent fired Branch because of its organizational restructuring, her performance issues, or because she applied for and

received 12 weeks' worth of intermittent FMLA leave.

Well, there is. This record is a perfect example of why there is more than one way to survive summary judgment in workplace discrimination and retaliation cases.

The Court's admittedly strict application of the Eleventh Circuit's binding precedent severing Branch's FMLA retaliation claim at the prima-facie stage does not foreclose the claim altogether. The burden-shifting framework from *McDonnell Douglas* "is not, and never was intended to be, the *sine qua non* for a plaintiff to survive a summary judgment motion in an employment . . . case." *Lewis v. City of Union City*, 934 F.3d 1169, 1185 (11th Cir. 2019).

> b.      *Convincing Mosaic*

The Court is, of course, referring to the convincing mosaic scheme which allows Branch to survive summary judgment if she presents circumstantial evidence such that a jury could infer intentional discrimination. *Id.* "A triable issue of fact exists if the record, viewed in a light most favorable to [an employee], presents a convincing mosaic of circumstantial evidence that would allow a jury to infer intentional discrimination by the [decision maker]." *Jenkins v. Nell*, 26 F.4th 1243, 1250 (11th Cir. 2022). Convincing mosaics may be shown through evidence demonstrating, *inter alia*, "suspicious timing, ambiguous statements, [as well as] other bits and pieces" of the record from which discriminatory intent may be inferred. *Id.*; *see also Lewis*, 934 F.3d at 1185. Also, employees may rely on "systematically better treatment of similarly situated

employees[]" and evidence that the employer's justification for an adverse employment decision was pretextual. *Jenkins*, 26 F.4th at 1250.

Here, Branch presents a mosaic of circumstantial evidence that raises genuine issues of material fact. Generally speaking, the sheer fact that we really don't know *who* the decision maker was makes it impossible, under the legal standards applicable to summary-judgment motions, to discern the intent behind Branch's termination. Further, this record is at a complete factual loss for *why* or *how* Dr. Saunder's approved plan of action to move Branch and have her report to Dr. Gilbreath somehow morphed into the removal of Branch's role. As Branch argues, there are "*ample* factual disputes and credibility determinations" that have to be made. [Doc. 62, p. 4].

The tiles that could construct Branch's convincing mosaic should, by now, be obvious. Specifically, "Navicent has offered a host of explanations for its decision to terminate [Branch]." [*Id.* at p. 2]. At one point, Navicent said that it terminated Branch for "lack of work." [*Id.*]; *see, e.g.*, [Doc. 62-5, p. 1]. GE Healthcare, however, was pushing for *more* resources from Navicent, not fewer. [Doc. 62, p. 2]; [Doc. 53, Martin Depo., pp. 61:17—62:6; 74:7—17]; [Doc. 62-1, ¶¶ 38, 41, 45]. And at other points, Navicent seemingly banks on Branch's performance issues to provide its legal justification for her termination. However, Sessley was adamant that it wasn't "even possible" for Branch to be "disciplined or reprimanded in any manner as a result of [her] presentation" at the ISFP meeting in July 2018. [Doc. 51, Sessley Depo., pp. 83:1—84:10]. And she's not out of

tiles yet. Dr. Saunders, a member of the Governance Committee, doesn't even know whether Branch's presentation was connected to the elimination of the Master Black Belt position, and subsequently, the termination of Branch herself. [Doc. 49, Saunders Depo., p. 45:18–21]; [Doc. 62-1, ¶ 90]. The fact that Dr. Saunders (to the extent she actually was a "decision maker") wasn't aware of Branch's eligibility for FMLA leave might carry the day for Navicent had she admitted she made the decision to fire Branch, but that wasn't her testimony. She said it wasn't even her idea to get rid of the Master Black Belt position. [Doc. 49, Saunders Depo., p. 21:8–23].

To put it bluntly, it boils down to this: If Navicent doesn't even know *who* terminated Branch, how on earth can it reasonably argue *why* the apparently anonymous and unknowable person (or people) who made the decision to fire her did so for only perfectly lawful reasons?

Further, when it comes to other elements to show pretext, the Eleventh Circuit concedes that "[n]ot every employee subjected to unlawful [retaliation] will be able to produce a similarly situated [employee]" for the simple and logical fact that one "may not exist in every work place." *Lewis*, 934 F.3d at 1185. So, that leaves one remaining inquiry: whether the shifting explanations for Branch's termination and the nebulous testimony about how *someone* came to that decision constitute pretext or a lie to cover its potential violation of the FMLA. *See Wolf v. Buss (America), Inc.*, 77 F.3d 914, 919 (11th Cir. 1996).

Pretext can be shown by "casting sufficient doubt" on the employer's proffered nonretaliatory reasons, by "showing that the employer's articulated reason is false and that the false reason hid [retaliation]," or by "establishing that the employer has failed to clearly articulate and follow its formal policies." *Lewis*, 934 F.3d at 1186. It's here that Branch points to the suspicious circumstances surrounding her termination.

One week after Dr. Saunders approved the redesign that would've moved Branch from Sessley to underneath Quality with Dr. Gilbreath, Cornue sent the text message to Sessley telling him: "We have to move forward with Yvette and not move her over to [Dr. Gilbreath]." [Doc. 55, Cornue Depo., p. 70:20—23]; [Doc. 51, Sessley Depo., pp. 105:13—106:10]; [Doc. 55-11, pp. 1—2]; [Doc. 51-15, pp. 1—3]. Branch contends that "Sessley's response to Cornue's text is telling[,]" in that Sessley "expressed no surprise at the news[,]" simply replying, "Ok, let['s] just get started with *lack of work* as long as [Dr. Gilbreath] doesn't block me[.]" [Doc. 62, p. 18]; [Doc. 51-15, pp. 2–3] (emphasis added). It's interesting that these text messages are on the record when Sessley denies, multiple times, that he was involved in the decision to fire Branch. *See, e.g.*, [Doc. 62-1, ¶ 129]. And, if that's not enough to cast sufficient doubt, Sessley testified that "[he] would be speculating" that at the time he told Branch she was fired that the reason was because "there was a lack of work for her to perform." [Doc. 51, Sessley Depo., p. 105:6–9].

At summary judgment, Branch is only required to "cast sufficient doubt" such

that a jury could infer that Navicent's "proffered [nonretaliatory] reasons were not what actually motivated its conduct." *Combs*, 106 F.3d at 1538. Branch has unquestionably carried that burden, and her retaliation claim under the FMLA will proceed to trial. Her mosaic of circumstantial evidence revolves around credibility findings of not only Dr. Saunders, Cornue, and Sessley, but other employees from both Navicent and GE Healthcare who were deposed or provided affidavits in this case. *See Jenkins,* 26 F.4th at 1251. The tiles discussed above are but a fraction of what Branch has at her disposal to demonstrate what is required for a jury to infer retaliatory intent. *Lewis*, 934 F.3d at 1185. There are, of course, "many conclusions a jury could reach based on the evidence presented," and some of those may not support a finding in Branch's favor. *Id.* at 1189. However, the "still mysterious" termination decision only highlights Navicent's potentially pretextual justifications that it offers to justify it. *Id.*; [Doc. 62, p. 4]. When a lawsuit's record sits as Branch's does here, it is a jury's role to weigh conflicting evidence and make any necessary credibility determinations. *Jenkins*, 26 F.4th at 1251. As noted at the beginning, it's not the Court's job to figure out Whodunnit?—it must hold a trial to get to the bottom of that all-important question. *Sconiers*, 946 F.3d at 1263.

If Branch were to put all the pieces of evidence together and present them to a jury, the Court easily concludes that a reasonable jury could infer intentional retaliation. *Lewis*, 934 F.3d at 1169; *Blash v. City of Hawkinsville*, 856 F. App'x 259, 267 (11th Cir. 2021) (per curiam).

2.      **Interference Under the FMLA**

Given that Navicent terminated Branch before she could use any of the intermittent FMLA leave for which she was eligible, she asserts that Navicent unlawfully interfered with her right to take it. [Doc. 1, p. 12]; *see* 29 U.S.C. § 2615(a). However, for purposes of an interference claim under the FMLA, the Eleventh Circuit has held that "the right to commence FMLA leave is not absolute." *Krutzig*, 602 F.3d at 1236. "[A]n employee can be dismissed, preventing her from exercising her right to commence FMLA leave, without thereby violating the FMLA, *if* the employee would have been dismissed regardless of any request for FMLA leave." *Id.* (emphasis added). Even though Branch's leave request was obviously granted in full, the evidence on this record is insufficient to conclude whether she would have been dismissed regardless of her request and eligibility for that leave. *Id.* Thus, she can still advance an FMLA interference claim. *See Benz v. Crowley Maritime Corp.*, 732 F. App'x 794, 804–05 (11th Cir. 2018) (citation omitted); [Doc. 62-1, ¶¶ 106, 108].

"[T]o succeed on an FMLA interference claim an employee need only demonstrate by a preponderance of the evidence that she was entitled to an FMLA benefit that was denied." *Batson v. Salvation Army*, 897 F.3d 1320, 1331 (11th Cir. 2018) (citations omitted). When it comes to an interference claim, an employee does not have to allege that her employer intended to deny a right because "the employer's motives are irrelevant[.]" *Id.*; *Benz*, 732 F. App'x at 804. Thus, where an employee's claim is

43

based on her termination, just like Branch's is here, "an employer may affirmatively defend against the claim by establishing that it would have terminated the employee regardless of her request for or use of FMLA leave." *Batson*, 897 F.3d at 1331; *McAlpin*, 2023 WL 2336584, at *13.

At summary judgment, a claim based on interference with an FMLA right due to an employee's termination essentially merges with an FMLA retaliation claim because of the similarities in their analyses. *Batson*, 897 F.3d at 1331. The ultimate inquiry at this stage is "whether the evidence, viewed in the light most favorable to the non-moving party, establishes as a matter of law that the employer would have terminated the employee regardless of her request for or use of FMLA leave." *Id.* The Hartford notified Branch that she was eligible for 12 weeks of intermittent leave in the midst of the Navicent-GE Healthcare partnership. [Doc. 62-1, ¶ 105]. Whether that timing had any bearing on the decision to terminate her is a question that the jury will inevitably decide for itself. For now, though, Branch "raises evidence from which a reasonable jury could conclude that [Navicent's] proffered explanations for terminating [her] were pretextual[.]" *Batson*, 897 F.3d at 1331.

Therefore, Branch "likewise raises a genuine dispute of material fact as to whether she would have been terminated regardless of her request for FMLA leave." *Id.* at 1331–32. Accordingly, Branch's FMLA interference claim will also proceed to trial, and it will be Navicent's "burden to establish its affirmative defense by showing that it

did not interfere with [Branch's] substantive rights under the FMLA by terminating [her]." *Id.* at 1331 n.6.

<u>**CONCLUSION**</u>

For the reasons discussed above, the Court **DENIES** Navicent Health, Inc.'s, and Simeon Sessley's Motion for Summary Judgment [Doc. 47], and the Court schedules this matter for trial during its April 2023 Trial Term for the week of April 24, 2023. The Court will shortly issue an order setting the pretrial conference that will require the parties to prepare and present a pretrial order. The parties should immediately begin preparing for trial as this case now firmly holds the primary position for the April 2023 Trial Term.

**SO ORDERED**, this 7th day of March, 2023.

S/ Tilman E. Self, III
**TILMAN E. SELF, III, JUDGE**
**UNITED STATES DISTRICT COURT**